COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Felton and Kelsey
Argued at Salem, Virginia


SHIRLEY CORRELL
                                                        OPINION BY
v.        Record No. 3387-02-3               JUDGE ROBERT J. HUMPHREYS
                                                    JANUARY 28, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF BEDFORD COUNTY
James W. Updike, Jr., Judge

John S. Edwards (Michelle C.F. Derrico; Law Office of John S.
Edwards, on briefs), for appellant.

Amy L. Marshall, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


Shirley Correll appeals her conviction, after a bench trial, for abuse or neglect of her

mother, Nellie Paxton, an incapacitated adult (in violation of Code § 18.2-369).[1]  Correll

contends the trial court erred in finding the evidence sufficient, as a matter of law, to establish

she "knowingly, willfully or maliciously caused any injuries or failed to provide treatment, care,

goods or services to [Paxton]."  Correll further argues that the trial court erred by:  1) allowing a

"non-medical 'gerontologist'" to testify as a medical expert; 2) allowing the gerontologist to

testify as to the credibility of Correll's statement to police; and, 3) allowing the gerontologist to

testify as to an ultimate issue in the trial.  For the reasons that follow, we affirm Correll's

conviction.

---

[1] Correll was also charged with felony murder of Paxton, in violation of Code §§ 18.2-33
and 18.2-369.  However, the trial court dismissed this charge at the close of the parties' evidence.
Accordingly, we do not address it further on appeal.

## I. Background

It is well settled that "[o]n appeal, we review the evidence in the light most favorable to the party prevailing below, together with all reasonable inferences that may be drawn." Benton v. Commonwealth, 40 Va. App. 136, 139, 578 S.E.2d 74, 75 (2003).

So viewed, the evidence established that on October 27, 2000, Paxton died, while a patient at Roanoke Memorial Hospital. Paxton was 83 years old. The cause of her death was "pneumonia due to corporeal emaciation and inanition due to chronic starvation." However, Paxton had suffered from Parkinson's disease, dementia and hypertension for several years prior to her death.

On August 3, 2001, a Bedford County Grand Jury indicted Correll for abuse or neglect of Paxton, an incapacitated adult, in violation of Code § 18.2-369. During Correll's three-day trial on the charge, the Commonwealth and Correll presented testimony from a number of witnesses, including medical experts, and presented a voluminous amount of medical documentation. A summary of the relevant evidence follows.

Correll was appointed as Paxton's legal guardian in 1997 and was Paxton's primary caregiver at the time of her death. Correll and Paxton's other family members began caring for Paxton on a consistent basis in 1991. At that time, Paxton was hospitalized for "bad" weight loss and fluid in her lungs. After a short period in the hospital, Paxton began to gain weight and the fluid in her lungs cleared.

Paxton was hospitalized again in 1997 for a broken hip. When Paxton was released from the hospital, doctors explained to Correll that she should make sure that Paxton "exercised every day" and was "up and going." Paxton's doctors explained that if this was not done, Paxton would suffer from "other complications like pneumonia, bedsores and things of this sort." Accordingly, Correll hired a home health aide to assist with Paxton's rehabilitation. She also

advised family members who helped with Paxton's care that they should make sure Paxton ate, make sure she took her pills, and make sure to "move her and keep her walking" so that Paxton "wouldn't get sore."

When visiting Paxton in 1997 and 1998, Carol Gray, Correll's sister, observed that Paxton appeared to be losing weight again, but "not drastically." Paxton's weight at that time was "around 130, 35 maybe."[2] Gray asked Correll about Paxton's continued weight loss and Correll told her Paxton's doctor had advised "[Paxton] would deteriorate, this was part of the disease or her Parkinson's disease."

Paxton was admitted to the hospital again in 1999, for another broken hip. Paxton put on "a little more" weight while she was in the hospital. After Paxton's hospital stay, Correll arranged for physical therapy for Paxton. Despite her advancing Parkinson's disease, Paxton healed substantially and "got up and was walking and everything."

Gray saw Paxton again during Christmas of 1999 and observed that Paxton had lost more weight. She also heard Paxton say, consistently, that she "hurt." When Gray asked Correll about this, Correll explained that Paxton said that "all the time, so basically they just, you know, ignored it."

Correll took Paxton to Dr. Adel Salama for a routine medical examination in January of 2000. At that time, Dr. Salama found that Paxton suffered from "advanced Parkinsonism, multi infarct dementia, hypertension, atrial fibrillation, osteoarthritis, along with early Stage 2 [bedsores]." Paxton displayed an albumin level of 3.9, indicating that she was not malnourished or undernourished at that time. Dr. Salama prescribed Duoderm patches for Paxton's bedsores, explained the care procedure for the bedsores to Correll, and advised Correll to keep him updated

---

[2] Gray testified that Paxton normally weighed "about" 135-140 pounds.

on Paxton's condition and to return for Paxton's regular follow-up examination in July of 2000. Paxton did not return to Dr. Salama in July of 2000 as scheduled.

In August of 2000, Gray visited Paxton again. Gray observed that Paxton "looked like a skeleton" and that her mental faculties had deteriorated to the point she was not sure Paxton "knew [she] was there."

Gray testified that when she saw Paxton again on September 9, 2000, during her niece's wedding, "[She (Gray)] almost passed out." Gray said Paxton was in a wheelchair and that Paxton looked so "bad," she "looked like she should have been laid out in the coffin." Gray testified that she did not mention this to Correll, but asked Correll's daughter about it. Correll's daughter stated that Paxton "ate more than her and her dad put together," but "this was just her medical condition."

Letice Baldwin, Gray's daughter, also observed Paxton during the wedding on September 9, 2000. Based on Paxton's appearance, Baldwin "was surprised [Paxton] was alive."

Francis Paxton, Correll's sister-in-law, testified that Paxton had always had a "small frame" "from the waist up." However, when she saw Paxton at the September 2000 wedding, she was "shocked" at Paxton's appearance.

A few days later, on September 18, 2000, Correll called an ambulance claiming that Paxton "had not eaten for the last day and had gotten dehydrated."

Emergency medical technicians found Paxton sitting in a chair, unresponsive, severely dehydrated, and "pretty close to going into shock." Paxton required "advanced life support." Sherry Weeks, one of the EMTs that responded to Correll's call, testified that Paxton's condition was "not consistent with only being dehydrated for a day."

When Paxton arrived at the hospital emergency room, she was unresponsive and cachetic, or "extremely emaciated." "You could see her ribs" and her "spine bones." Paxton also had a

"healing ulcer on her sternum, mid chest [sic]," an ulcer on her "sacral area," and a "severe" "active or open ulcer on her right hip."

Correll told emergency room nurses that Paxton "began two days ago with decreased appetite and fluid intake," and had been "losing weight for three weeks." Dixie Daniel, an emergency room nurse who treated Paxton, testified that her assessment of Paxton indicated that Paxton's condition would have taken "more than two days to occur" and that the bedsores found on Paxton would generally take "weeks" to form.

Another emergency room nurse, Tracey Allison Mann, testified that Paxton's condition upon arrival at the hospital was "shocking." Paxton was "morbidly emaciated," "covered with . . . bedsores," and "contracted at every extremity in a fetal position." According to Mann, Paxton's contractures had "been in place for some time and were fixed." Mann testified that although Correll told her Paxton had been ambulatory just two days prior to her admission to the hospital, she believed Paxton had been "contracted" for greater than one month. Mann opined that Paxton's most severe bedsores, which displayed "black, dead tissue," would have resulted from a "prolonged" period of pressure of a "month or greater."

Dr. Salama examined Paxton when she was admitted to the hospital and observed that Paxton appeared clean, but suffered from "[v]ery severe" "undernutrition," "[m]oderately severe to severe" dehydration, and "[a]dvanced Stage 3" or "early Stage 4" bedsores. Because of Paxton's undernourishment and bedsores, as well as her age and Parkinson's disease with dementia, Salama thought, "I'm going to lose her."

Dr. Salama testified that bedsores are caused by "three or four factors": 1) "[t]he patient sitting in one position for a long time"; 2) "moisture of the skin"; and 3) "friction." He stated that Paxton was predisposed to suffer from bedsores, but that with proper care, such sores would not advance "into Stage 3." Salama also stated that although Paxton's albumin had significantly

decreased since January of 2000 (indicating undernourishment), albumin has "a long life," taking 21 days to display a change. However, he testified that refusal to take in fluids for 48 hours would be a sufficient time for Paxton to have displayed such severe dehydration.

Dr. Salama opined that Paxton's undernourishment and bedsores were severe:

> But definitely what I'm guessing, that [sic] they developed over days, weeks – to [sic] weeks, but not hours or not 24. I don't think I have ever seen Stage 4 or Stage 3 [bedsores] developing over 48 hours.

He testified that it was not Paxton's Parkinsonism or atrial fibrillation that brought her to the hospital that day, but it was the bedsores, the undernourishment and the severe dehydration that "posed a significant threat on her life and health."

Paxton "slow[ly]" responded to treatment during her stay in the hospital. Paxton was discharged to a nursing home on October 3, 2000.

Just prior to Paxton's discharge to the nursing home, Bedford County Social Services contacted Martha Anderson, a geriatric nurse, and asked her to perform an assessment of Paxton's condition. Anderson reviewed Paxton's medical records, performed a "brief physical assessment" of Paxton and interviewed Correll. Correll advised Anderson that she provided constant care to Paxton, with the help of her two daughters, that Paxton ate "very well up until last [sic] week or so," that Paxton was able to ambulate with her walker, and that Paxton sat in a plastic kitchen chair during the day. Correll contended that Paxton "probably . . . got that scrape on her chest from leaning forward and slumping onto the table." Correll also informed Anderson that she did not know how to use the Duoderm patch Dr. Salama prescribed for Paxton's bedsores. Anderson noted in her interview notes that Correll didn't seem to understand the "level of care" necessary for Paxton's bedsores.

Hunter Sisler, Director of Admissions and Social Services at Burrell Nursing Center, asked Correll about Bedford County Social Services' investigation when she admitted Paxton to

the nursing home. Sisler asked Correll what impact the investigation would have on any discharge plan for Paxton. Correll told Sisler that "the problems with care which evolved into Adult Protective Services being called in were because of the care given by [Correll's] granddaughter." Correll stated that "she herself was going to step in and take over and, therefore, the plan was that she would hopefully get [Paxton] back home under her care."

Paxton's condition improved during her stay in the nursing home. Paxton was "interacting with the staff," was "eating better," and her "wounds had begun to heal." However, Paxton contracted aspirational pneumonia, on or about October 27, 2000, and died from that condition. Dr. Salama testified that such an infection is caused when a person is "not feeding properly," vomits, and then suffers from a related infection in the lungs.

Dr. William Massello, the medical examiner who performed the autopsy on Paxton, testified that he found Paxton to be in a "state of chronic starvation." He further stated that, in his experience, individuals suffering from Parkinson's disease, even in conjunction with dementia, are "very often well nourished" "when they come to autopsy." He found Paxton's cause of death to be "pneumonia due to corporeal emaciation and inanition due to chronic starvation."

Dr. Massello agreed that pneumonia is a "natural foreseeable consequence of starvation." He stated that in order to display that type of chronic starvation, in general, "in a woman who is 83 years old," "[i]t would take several weeks" to lose the weight involved. He further stated that he found no condition, upon examination of Paxton, that would have prevented her from consuming food, or any "prior medical problems or conditions" that would have prevented her from "absorbing and metabolizing the food." He stated that her condition was not consistent with someone who was eating "three wholesome meals a day."

At the close of the Commonwealth's evidence, Correll presented testimony of several witnesses establishing her devotion to her mother's constant care. Dr. Donald Nolan, a neurologist who treated Paxton from 1991 to 1998 ("on and off"), testified that Paxton "always looked terrible. She was just emaciated." Dr. John Wenger, who was admitted to testify as an "expert in family practice," testified that geriatric patients can suffer from "cachexia," or starvation/"wasting away," even though they may be eating on a regular basis.

In rebuttal, the Commonwealth presented the testimony of Dr. Rose Jensen, Director of Gerontology at Lynchburg College. After presenting her qualifications, the Commonwealth moved that she be deemed an expert in the "area of gerontology." Other than questioning what the field of "gerontology" encompassed, and asking whether any "medical" opinions Jensen would render would come from her background as a nurse, Correll's counsel raised no objection to her qualification as an expert in the field.

When the Commonwealth asked Jensen whether Correll's statement that Paxton "had been eating regularly" was "consistent or inconsistent with the condition of [Paxton] on admission to the hospital," Correll's counsel objected. Correll's counsel gave the following as the grounds for the objection: "Is she just supposed to read and interpret the evidence?" The trial court responded, in relevant part, as follows:

> [T]he Supreme Court said that the question can be asked but care must be taken in asking of the question to make sure that the question does not ask the expert to voice an opinion as to – or to comment upon credibility of witnesses, weight of the evidence, that kind of thing. Because no witness we know can do that.
>
>     *     *     *     *     *     *     *
>
> But if the expert is just – and it's being brought to the expert witness's attention [sic] matters that are in evidence. And if the expert is merely using those matters to formulate his or her own opinion, you may do that. But of course cannot [sic] comment upon the weight to be accorded any other evidence or credibility of witnesses. . . . So within that context take care in asking the questions, and I think that provides us guidance.

After the Commonwealth rephrased the question, Correll's counsel again objected, stating "That's where my objection comes in, Your Honor." The trial court ruled that the question "can be formed in the hypothetical . . . so that is not a comment upon the credibility or weight." The Commonwealth again rephrased the question and Correll's counsel objected for a third time, stating "I raise my objection, Your Honor." The trial court ruled, "I'm going to allow that question to be asked."

Nevertheless, the Commonwealth rephrased the question once again and asked "Is the patient's condition upon admission to the hospital consistent or inconsistent with someone who had been moved frequently, turned, repositioned, and had proper wound care for those wounds?" Dr. Jensen responded, "Inconsistent." The Commonwealth then asked "Is the patient's condition upon admission to the hospital on September the 18th consistent or inconsistent with someone who has been fed and received proper hydration?" Dr. Jensen responded, "Inconsistent." Correll's counsel did not object to these newly phrased questions, nor did Correll's counsel object to Dr. Jensen's responses to the questions.

In closing, Correll's counsel argued that the evidence presented by the Commonwealth was insufficient to prove any knowing and willful neglect on the part of Correll in caring for her mother. Correll's counsel contended Paxton's injuries were merely a result of her terminal illness and advanced age. Specifically, Correll's counsel stated, "Judge, we'd ask for the Court to dismiss on both charges . . . this lady was not killed by my client. And, secondly, that any failing of my client in the care of her mother were [sic] not willful, they were not knowing, and they were not felonious, and they were not criminal."

The trial court subsequently found Correll guilty of neglect, pursuant to Code § 18.2-369, finding that Correll was the appointed guardian for Paxton, that Paxton was an incapacitated adult, that Paxton suffered from "life-threatening conditions" at the time of her admission to the

hospital, and that the conditions resulted from Paxton's "knowing and willful" failure to provide

Paxton with "treatment, care, goods and services." In reaching its conclusion, the court

specifically considered the fact that Correll had taken care of her mother for several years, that

Paxton suffered from a terminal illness, that Paxton was difficult to care for, and that Paxton had

been a thin woman. However, based upon the totality of the evidence, the trial court found that

the Commonwealth had carried its burden.[3]

Prior to sentencing Correll, the trial court reaffirmed its findings and its verdict of guilt.

The trial court then sentenced Correll to serve two years in prison, with one year and eleven

months suspended.

## II. Analysis

On appeal, Correll argues the trial court erred in finding the evidence sufficient to support

her conviction. Specifically, Correll contends "there was no evidence [she] knowingly, willfully

or maliciously caused any injuries or failed to provide treatment, care, goods or services" to

Paxton as required by Code § 18.2-369.[4] In support of her argument, Correll claims the

---

[3] Approximately eleven months later, Correll's new counsel made a motion to re-open the proceedings, or in the alternative for the court to reconsider its verdict. After hearing arguments of counsel and a large portion of Correll's proffered evidence, the trial court denied Correll's "motion to re-open the hearing and/or reconsider and to present additional evidence." The trial court further held "I will consider anything that's been testified to by the witness thus far in the context that it has any relevancy to mitigation of punishment. So the testimony will be considered in that limited [context]." For this reason, we do not consider Correll's counsel's numerous citations to this post-trial "evidence" in his briefs on appeal.

[4] Code § 18.2-369 provides as follows, in relevant part:

> A. It shall be unlawful for any responsible person to abuse or neglect any incapacitated adult as defined in this section. . . . Any responsible person who is convicted of a second or subsequent offense under this subsection shall be guilty of a Class 6 felony.

> B. Any responsible person who abuses or neglects an incapacitated adult in violation of this section and the abuse or

- 10 -

Commonwealth was required to prove the element of "malice" with regard to the acts in the indictment which allegedly occurred before July 1, 2000, the date upon which the statute was amended by substituting the terms "knowing and willful" in place of "malicious." See 2000 Va. Acts, ch. 796. Correll further claims that the Commonwealth failed to prove her conduct "resulted" in Paxton's condition. Finally, Correll argues the trial court erred in allowing Dr. Jensen to testify as a "medical expert," and in allowing her to testify as to the credibility of Correll's statement to police, as well as to an "ultimate issue in the case."

We find no merit in Correll's contentions and affirm the judgment of the trial court.

---

neglect results in serious bodily injury or disease to the incapacitated adult shall be guilty of a Class 6 felony.

C. For purposes of this section:

"Abuse" means (i) knowing and willful conduct that causes physical injury or pain or (ii) knowing and willful use of physical restraint, including confinement, as punishment, for convenience or as a substitute for treatment, except where such conduct or physical restraint, including confinement, is a part of care or treatment and is in furtherance of the health and safety of the incapacitated person.

\* \* \* \* \* \* \*

"Neglect" means the knowing and willful failure by a responsible person to provide treatment, care, goods or services which results in injury to the health or endangers the safety of an incapacitated adult.

\* \* \* \* \* \* \*

"Serious bodily injury or disease" shall include but not be limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, or (vi) life threatening internal injuries or conditions, whether or not caused by trauma.

Correll does not dispute the trial court's findings that she was a "responsible person" under the statute and that Paxton was an "incapacitated person."

A.

As stated above, in reviewing a claim of sufficiency of the evidence on appeal, we "consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth[,]" the party prevailing below. Derr v. Commonwealth, 242 Va. 413, 424, 410 S.E.2d 662, 668 (1991). We must affirm the trial court's judgment unless "plainly wrong," Phan v. Commonwealth, 258 Va. 506, 511, 521 S.E.2d 282, 284 (1999), and we will not overrule that judgment and "'substitute [our] own judgment, even if [our] opinion might differ from [the trial court's].'" Id. (quoting George v. Commonwealth, 242 Va. 264, 278, 411 S.E.2d 12, 20 (1991)); see also Sanchez v. Commonwealth, 41 Va. App. 319, 335, 585 S.E.2d 327, 335 (2003).

Furthermore,

> [i]t is within the province of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts presented. Witness credibility determinations shall only be disturbed on appeal if the testimony is "inherently incredible, or so contrary to human experience so as to render it unworthy of belief."

Sanchez, 41 Va. App. at 335, 585 S.E.2d at 335 (quoting Fisher v. Commonwealth, 228 Va. 296, 299-300, 321 S.E.2d 202, 204 (1984)) (other citations omitted).

We do not address Correll's claims that the trial court erred in requiring the Commonwealth to prove the element of "malice" with regard to all conduct occurring prior to July 1, 2000, and erred in finding her conduct resulted in what amounted to "serious bodily injury" to Paxton, because the record reflects Paxton failed to raise these arguments below. Indeed, Paxton raised no motions to strike and in closing argument, argued only that the Commonwealth failed to establish she "killed" Paxton and/or that she acted "knowingly and willfully."

Pursuant to Rule 5A:18, we "will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998); Rule 5A:18. The same argument must have been raised, with specificity, at trial before it can be considered on appeal. See Buck v. Commonwealth, 247 Va. 449, 452-53, 443 S.E.2d 414, 417 (1994); Floyd v. Commonwealth, 219 Va. 575, 584, 249 S.E.2d 171, 176 (1978). The purpose of this rule is to insure that the trial court and opposing party are given the opportunity to intelligently address, examine, and resolve issues in the trial court, thus avoiding unnecessary appeals. See Lee v. Lee, 12 Va. App. 512, 514, 404 S.E.2d 736, 737 (1991); Kaufman v. Kaufman, 12 Va. App. 1200, 1204, 409 S.E.2d 1, 3-4 (1991). Therefore, "a challenge to the sufficiency of the Commonwealth's evidence is waived if not raised with some specificity in the trial court." Mounce v. Commonwealth, 4 Va. App. 433, 435, 357 S.E.2d 742, 744 (1987). For these reasons, we do not address the merits of Correll's newly-coined arguments for the first time on appeal.

Turning next to Correll's claim that the evidence was insufficient to prove she "knowingly" and "willfully" caused injury to Paxton or failed to provide her with proper care, as well as her claim that the evidence was insufficient to prove Paxton's condition "result[ed]" from her conduct, we find no error in the trial court's determination.

As Correll correctly points out, the statute requires such neglect or failure to provide "treatment, care, goods or services" to be "knowing and willful." The meaning of "willful," as it is used in Code § 18.2-369, appears to be an issue of first impression. Nevertheless, we find the meaning of the word in other contexts applies here. See King v. Commonwealth, 2 Va. App. 708, 710, 347 S.E.2d 530, 531 (1986) ("The validity of using other Code sections as interpretive guides is well established. The Code of Virginia constitutes a single body of law, and other sections can be looked to where the same phraseology is employed.").

"Willful" generally means an act done with a bad purpose, without justifiable excuse, or without ground for believing it is lawful. See Richardson v. Commonwealth, 21 Va. App. 93, 99, 462 S.E.2d 120, 123 (1995). The term denotes "'an act which is intentional, or knowing, or voluntary, as distinguished from accidental.'" Snead v. Commonwealth, 11 Va. App. 643, 646, 400 S.E.2d 806, 807 (1991) (quoting United States v. Murdock, [290 U.S. 389, 394] (1933)). The terms "bad purpose" or "without justifiable excuse," while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality. See Murdock, 290 U.S. at 395-96.

Ellis v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999). In the absence of direct evidence of intent, such "willfulness" must be established through circumstances. Lambert v. Commonwealth, 6 Va. App. 360, 363, 367 S.E.2d 745, 747 (1988).

Although we have recognized that "willful maltreatment of a [victim] requires 'something worse than good intentions coupled with bad judgment,'" Ellis, 29 Va. App. at 556, 513 S.E.2d at 457 (quoting Mullen v. United States, 263 F.2d 275, 276 (D.C. Cir. 1958)), we do not find the trial court's determination of knowing and willful conduct, on this record, to be plainly wrong. Indeed, considering the totality of the evidence in the light most favorable to the Commonwealth, the record clearly reflects that Paxton was severely emaciated and dehydrated when she was admitted to the hospital in September of 2000. The testimony and evidence proved that Paxton's emaciation was so severe, it would have taken "several weeks" to occur. Further, Paxton was covered with "severe" bedsores, several of the type that were so deep as to invade muscle tissue and bone. The testimony also proved that the bedsores suffered by Paxton contributed to her life threatening state and that bedsores demonstrating the level of acuteness as those suffered by Paxton would, likewise, take several weeks to develop.

Dr. Massello testified that, during his autopsy examination of Paxton, he found no condition which would have caused her to be unable to eat, nor which would have caused her body to fail to absorb and/or metabolize food. He also testified that her condition was not

- 14 -

consistent with an individual who had been eating "three wholesome meals a day." Indeed, no testimony was offered indicating that, *at the time of her death*, Paxton suffered from any specific condition that would have caused her body to fail to absorb food or water. Nor was there any evidence establishing that Paxton suffered from any condition that would have caused her to spontaneously develop severe, life threatening, bedsores.

Moreover, several witnesses testified that, at least as of early September, Paxton's condition and appearance was "shocking." Although there was no dispute that Paxton was a relatively thin woman and had consistently lost weight during the final few years of her life, the evidence proved that as of the time of her admission to the hospital, family members and friends were very concerned about her condition. Yet, Correll failed to seek medical help for Paxton for some eight months prior to her admission to the hospital.

The evidence in this record, when considered in its totality, demonstrates that Correll was clearly capable of comprehending the seriousness of Paxton's condition, as well as her need for constant and immediate care. In fact, Correll had cared for Paxton for years prior to her death, and had specifically cared for Paxton in relation to her weight problem and the various bedsores that she had developed over the years. Thus, we simply cannot hold that the trial court's finding of willful and knowing neglect was plainly wrong. Indeed, testimony given during the trial established that Correll acknowledged Paxton was not being properly cared for prior to her admission to the hospital and that those "problems" were what prompted the investigation by Bedford County Social Services.

Given the totality of this evidence, including the extreme nature of Paxton's condition at the time of her admission to the hospital, we find sufficient evidence in the record from which the trial court could find that Correll's failure to provide Paxton with the appropriate food and/or care, including medical care, amounted to more than bad judgment. Specifically, the evidence

supports the trial court's finding that Correll's conduct amounted to a voluntary, knowing omission which Correll could not have reasonably believed was lawful or excusable. See Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 785 (2003) ("While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" (quoting Derr, 242 Va. at 425, 410 S.E.2d at 669)).

For these same reasons, we conclude that the trial court committed no error in determining that the evidence proved Correll's conduct, or lack thereof, "resulted" in Paxton's condition when she presented to the hospital in September of 2000.

Although Correll accurately points out that circumstantial evidence may establish the elements of a crime, *provided it excludes every reasonable hypothesis of innocence*, see, e.g., Tucker v. Commonwealth, 18 Va. App. 141, 143, 442 S.E.2d 419, 420 (1994), "[t]he statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." Hudson, 265 Va. at 513, 578 S.E.2d at 785. This Court must determine "not whether 'there is some evidence to support'" Correll's hypothesis of innocence, but, rather, "whether a reasonable [fact finder], upon consideration of all the evidence, could have rejected [Correll's] theories . . . and found [her] guilty . . . beyond a reasonable doubt." Id. Whether a hypothesis of innocence is reasonable is a question of fact. See Cantrell v. Commonwealth, 7 Va. App. 269, 290, 373 S.E.2d 328, 339 (1988). Such factual findings by the trial court are binding on appeal unless plainly wrong. See Glasco v. Commonwealth, 26 Va. App. 763, 774, 497 S.E.2d 150, 155 (1998).

Finding no such plain error, we affirm the trial court's judgment in this regard.

B.

We next address Correll's contention that the trial court erred in allowing Dr. Jensen to testify as a "medical expert," and in allowing her to testify as to the credibility of Correll's statement to police, as well as to an "ultimate issue" in the trial. Once again, on this record, we find that we are precluded from considering these alleged errors because Correll failed to properly preserve them for purposes of appeal. See Rule 5A:18. Indeed, the record reflects that Correll raised no argument below with regard to Dr. Jensen's qualifications, or her ability to testify as a "medical expert." Further, although Correll's counsel objected to several of the Commonwealth's questions on the sole grounds that Dr. Jensen should not be allowed to "read and interpret the evidence," counsel raised no specific argument that the Commonwealth's questions improperly sought comment on Correll's credibility. Nor did Correll's counsel argue that the Commonwealth improperly sought comment on an ultimate issue in the trial.

Perhaps more importantly, the record demonstrates that Correll's counsel raised no objection at all to the Commonwealth's ultimate questions to Dr. Jensen, which the Commonwealth had *rephrased* in accordance with the trial court's rulings on the earlier objections – rulings that specifically admonished the Commonwealth to refrain from asking Dr. Jensen to comment on Correll's credibility or the weight of the evidence. Moreover, Correll's counsel raised no objection to Dr. Jensen's responses to these questions. Accordingly, we find that we are precluded from considering these issues on appeal because Correll failed to put the trial court on notice of these specific grounds, and ultimately failed to contemporaneously object to the ultimate questions at issue in this appeal. See Rule 5A:18; Clark v. Commonwealth, 30 Va. App. 406, 411, 517 S.E.2d 260, 262 (1999) ("An objection made at trial on one ground does not preserve for appeal a contention on a different ground.").

For the reasons stated in this opinion, we find no error on the part of the trial court and we affirm Correll's conviction.

Affirmed.