COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Athey, Fulton* and Lorish

ASENSO EDMUND ATTAH

                                            MEMORANDUM OPINION**

v.      Record No. 1029-24-4                        PER CURIAM
                                                  JANUARY 6, 2026

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Bruce Strickland, Judge

(Monica Tuck, Assistant Public Defender; Virginia Indigent Defense
Commission, on briefs), for appellant.

(Jason S. Miyares, Attorney General; Lindsay M. Brooker, Assistant
Attorney General, on brief), for appellee.

Following a jury trial, the Circuit Court of Stafford County ("trial court") convicted

Asenso Edmund Attah ("Attah") of three counts of rape, four counts of aggravated sexual

battery, four counts of indecent liberties, and one count of object sexual penetration. The trial

court sentenced Attah to 130 years of incarceration, with 100 years suspended. On appeal, Attah

contends that the trial court erred by giving Jury Instructions 22 and 23 over his objection and by

finding the evidence sufficient to prove force, threat, or intimidation regarding his convictions

for rape, aggravated sexual battery, and object sexual penetration. For the following reasons, we

affirm.[1]

---

* Justice Fulton participated in the decision of this case prior to his investiture as a Justice of the Supreme Court of Virginia.

** This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the appeal is wholly without merit." *See* Code § 17.1-403(ii)(a); Rule 5A:27(a).

# I. BACKGROUND[2]

In April of 2022, when O.W.[3] was 14 years old, her mother brought her and her younger sister, M.W., from their home in Ghana to the United States to live with their father. After their mother returned to Ghana, the girls resided with their father who was living in the basement of Attah's house in Stafford County. Because their father lacked the "necessary paperwork," Attah—"a family friend" whom the girls' father had previously met in Ghana—became the girls' legal guardian. The guardianship permitted the girls to enroll in the Stafford County public school system.

At trial, O.W. testified that their families were "[v]ery close" and had known each other when they lived in Ghana. O.W. further testified that she thought of Attah, who was in his fifties, as an "uncle, kind of like a father figure," and called him "Uncle Eddie." O.W. explained that after initially experiencing "a regular niece uncle relationship" with Attah, his behavior became "inappropriate." He started calling O.W. his "girlfriend" and "staring" at her for extended periods of time. At one point, he spoke to her about sex and asked whether she had a boyfriend.

According to O.W., by the fall of 2022, Attah began sexually abusing her. O.W. testified that on one occasion that fall, she returned from school and, after initially going into the basement, she walked upstairs and placed her bag in the washing machine, which was located on the main level of the house. She stated that when she attempted to return to the basement, Attah

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[3] We use initials to protect the privacy of the minor victim and her younger sister.

blocked her, held her hands, and walked her back to the top of the basement stairs. She testified that upon reaching the top of the basement stairs, Attah "pulled [her] closer to him" and "grabbed [her] breast" through her tank top. When she tried to get away from Attah, he kissed her on the lips. She further testified that Attah then "grabbed" her arm and asked her to go upstairs with him to the guest bedroom. She testified that in that moment, she was "confused and trying to figure out what [Attah] was trying to do," but she went with him to the guest bedroom. She observed that she "felt like he was the adult and [she] was the child." Once in the upstairs guest bedroom, Attah closed the bedroom door and "started grabbing" her breast, stating that he was going to have sex with her. She further testified that Attah placed his finger "down there" "[i]nside the folds" and "pulled [her] pants down" before asking her to lay on the bedroom floor. She explained that she complied because she was "the child and [Attah was] the adult," and she worried that he would kick her out of his house if she refused. Attah then "put his penis in [her] vagina," and although she testified that she told him it "hurt really badly," "[h]e just went on." O.W. stated that she "tried to close [her] legs but [Attah] pushed them open." She further testified that after Attah ejaculated, he told her that if she told anyone, he would get arrested and she, her sister, and her father "would be deported out of the country because [they] are undocumented." She revealed that she bled for "the next couple of days" and that it was painful for her to walk.

O.W. further testified that as a result of Attah's threats, which had a "huge impact" on her, she felt she could not tell anyone what had occurred—even her sister, whom she "told everything to." She explained to the jury that she thought, "This is what is going to happen to me now. . . . Like this is going to be the rest of my life." She did not report the abuse because she was concerned that if she told someone, she would not receive the education she wanted and the better life her parents sought for her. O.W. also testified that she believed she could not

physically resist Attah because he was a veteran, "probably very well trained in self defense," and "way bigger" than her. She stated that her "entire thought process during that time was getting out of there safe" for her family.

O.W. also recalled Attah subsequently sending her a text message on another day during the fall of 2022 telling her to come to his bedroom. She explained that she complied and went upstairs because she was "too scared that [she] was going to get kicked out of the house and not have anywhere else to live." Attah initially talked to her about a test that M.W. had failed, but then "the subject changed . . . to him having sex with [O.W.] again." She testified that Attah "started grabbing [her] breast" over her clothes and then pulled down his pants. He then pulled down her pants and "[h]is penis went into [her] vagina." O.W. explained that she did not physically resist Attah because of his size and military training. She also recalled that after Attah ejaculated, he "reinforced" that she could not tell anyone.

O.W. further testified that on a third occasion, Attah sent her a text message telling her to "come up there again." When she went to Attah's bedroom, he walked her into the bathroom and closed the door behind them. Attah then stood behind O.W., "grabbed [her] breast," and "had sex with [her] again." At first, she was "bent over" and "holding on to the tank" of the toilet.[4] She testified that Attah then sat on the toilet and manipulated her to sit on his penis by holding her arms and pushing her down and up. While doing so, his penis penetrated her vagina once. The abuse was interrupted when M.W. knocked on the bedroom door looking for O.W. In response, "[h]e quickly asked [O.W.] to pull [her] pants up" and went to see who was at the door. When M.W. subsequently asked O.W. what she was doing in Attah's bedroom, O.W. lied and

---

[4] O.W. explained that she thought Attah "put in" his penis while he was behind her, "because it hurt every time he had sex with [her]."

said she was "just cleaning." Once again, O.W. testified that she did not tell her sister that Attah sexually assaulted her because of Attah's threat regarding deportation.

On October 10, 2022, O.W. messaged her former teacher in Ghana and reported Attah's sexual abuse of her. M.W. saw the messages and confronted O.W. about them. O.W. then revealed to her sister that Attah had been sexually assaulting her. M.W. subsequently contacted their mother in Ghana, who then told their father. O.W. spoke with her father, and he "told [her] to make a recording of the next time [Attah] tried to have sex with [her]."

Following O.W.'s conversation with her father, Attah again told her to meet him upstairs, this time in his son's bedroom. O.W. got to the room first and hid her phone in a laundry basket to create an audio recording of the ensuing interaction. Attah entered the room and "started touching [O.W] and [she] said [she] didn't want him to touch [her]." After asking O.W. multiple times why she did not want him to touch her, Attah apologized for taking advantage of her.[5] O.W. prompted Attah to leave the room first, then retrieved her phone. The next day, O.W., M.W., and their father moved out of Attah's house, and O.W.'s father reported the matter to the police before taking O.W. to the hospital.

At the conclusion of the Commonwealth's evidence, Attah moved to strike, which the trial court denied. During Attah's case in chief, his wife, Cecilia Addae ("Addae"), testified that she and O.W. spoke often and that O.W. had been acting normally around the time that O.W. said the sexual assaults occurred. Addae also did not recall O.W. acting scared or avoiding Attah and testified that she saw no signs that suggested anything inappropriate was happening between Attah and O.W. Additionally, according to Addae, O.W.'s father raped Addae shortly before O.W. made the complaint. Addae claimed she told O.W.'s father that she was going to tell his

_____

[5] Reviewing the contents of the voice recording in the light most favorable to the Commonwealth, Attah told O.W. that he was "sorry," and when prompted by O.W. to explain what he was sorry "for," he stated, "for doing what you are not willing to do."

ex-wife what he had done, and two days after that conversation, O.W. accused Attah of the sexual assaults.

In rebuttal, Detective Joshua Lynch testified that during his investigation of the case, Addae never advised him that O.W.'s father raped her and that, in fact, Addae refused to be interviewed during the investigation. At the conclusion of all the evidence, counsel for Attah renewed his previous motion to strike, which was again denied by the trial court.

The Commonwealth proposed Jury Instructions 22 and 23, both of which were objected to by counsel for Attah. Jury Instruction 22 stated, "Fear of bodily harm does not require proof that the victim feared some type of bodily harm other than the harm inherent in sexual assault." Jury Instruction 23 provided, "When determining whether the defendant's conduct placed the victim in fear of bodily harm, you may consider the victim's age, the relative size of the defendant and the victim, and the vulnerable position of the victim." Although counsel for Attah conceded that both proposed jury instructions were accurate statements of the law, he made a "pro forma objection" because the proposed instructions were not Virginia model jury instructions. The Commonwealth requested that the trial court instruct the jury, in part, by giving Jury Instruction 22 and Jury Instruction 23 pursuant to Code § 19.2-263.2.[6] The trial court, acknowledging the concession that the instructions were accurate statements of the law, ruled that the proposed instructions would be given to the jury.

The jury was instructed and, following closing arguments, retired to deliberate. The jury subsequently returned, finding Attah guilty of three counts of rape, four counts of aggravated sexual battery, four counts of indecent liberties, and one count of object sexual penetration.

---

[6] "A proposed jury instruction submitted by a party, which constitutes an accurate statement of the law applicable to the case, shall not be withheld from the jury solely for its nonconformance with model jury instructions." Code § 19.2-263.2.

Attah subsequently filed a motion to set aside the verdict, which the trial court denied. The trial court sentenced Attah to 130 years of incarceration, with 100 years suspended. Attah appealed.

## II. ANALYSIS

### A. *Standard of Review*

"When considering on appeal whether the evidence was sufficient to support a criminal conviction, 'we review factfinding with the highest degree of appellate deference.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting *Bowman v. Commonwealth*, 290 Va. 492, 496 (2017)). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Id.* (quoting Code § 8.01-680). "The only 'relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

### B. *Attah's assignment of error challenging Jury Instructions 22 and 23 is waived.*

On appeal, Attah contends that Jury Instructions 22 and 23 "improperly highlighted evidence favorable to the Commonwealth's argument" and "were likely to confuse the jury in the context of this case." But Attah did not raise these specific arguments below, so we do not consider them.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of the rule requiring an adequately articulated objection is to allow both the trial court and the opposing party 'the opportunity to intelligently address, examine, and resolve issues in the trial court' in order to avoid unnecessary appeals and retrials." *Banks v. Commonwealth*, 67 Va. App. 273, 285

(2017) (quoting *Correll v. Commonwealth*, 42 Va. App. 311, 324 (2004)). "Procedural-default principles require that the argument asserted on appeal be the same as the contemporaneous argument at trial." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). Thus, "we 'will not consider an argument on appeal which was not presented to the trial court.'" *Correll*, 42 Va. App. at 324 (quoting *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998)).

At trial, counsel for Attah conceded that Jury Instructions 22 and 23 were accurate statements of law, made only a "pro forma" objection to the instructions, and commented that the basis for his objection was that the instructions were not Virginia model jury instructions. While Attah contends that his objection was broad enough to place the issues he now raises before the trial court for its consideration, we disagree; his "pro forma" objection was nothing more than a declaration that Jury Instructions 22 and 23 were not model jury instructions. *See Bethea*, 297 Va. at 744 ("[N]either an appellant nor an appellate court should 'put a different twist on a question that is at odds with the question presented to the trial court.'" (quoting *Commonwealth v. Shifflett*, 257 Va. 34, 44 (1999))). Thus, the trial court had no opportunity to rule on the arguments Attah presents on appeal. *See Banks*, 67 Va. App. at 285. Although Rule 5A:18 contains exceptions, Attah has not invoked either exception, "and we do not consider them *sua sponte*." *Spanos v. Taylor*, 76 Va. App. 810, 827-28 (2023). Accordingly, Rule 5A:18 bars us from reaching the merits of Attah's arguments. *See Bethea*, 297 Va. at 743; *Correll*, 42 Va. App. at 324.

C. *The evidence was sufficient to prove intimidation.*

Attah further challenges his convictions on three counts of rape, four counts of aggravated sexual battery, and one count of object sexual penetration, by asserting that the evidence was insufficient to establish a common element of all three offenses—accomplishment

"by force, threat or intimidation." *See* Code §§ 18.2-61(A), -67.2(A)(2), -67.3(A)(4). We disagree.

"The issue of whether the crime was committed by 'force, threat or intimidation' is a question of fact." *Bondi v. Commonwealth*, 70 Va. App. 79, 88 (2019) (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002)). "Intimidation requires 'putting a victim in fear of bodily harm by exercising such domination and control of her as to overcome her mind and overbear her will.'" *Sabol v. Commonwealth*, 37 Va. App. 9, 18 (2001) (quoting *Sutton v. Commonwealth*, 228 Va. 654, 663 (1985)). "[F]ear of bodily harm must derive from some conduct or statement of the accused," *id.*, but such fear "need not be separate and apart from the fear of the possibility of bodily injury inherent in the sexual assault itself." *Bondi*, 70 Va. App. at 90. "Intimidation may be caused by the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure." *Sabol*, 37 Va. App. at 18 (quoting *Sutton*, 228 Va. at 663); *see also Benyo v. Commonwealth*, 38 Va. App. 650, 654-55 (2002) ("[A]s a matter of law, proof of psychological pressure and 'emotional domination [may be] sufficient to constitute intimidation.'" (second alteration in original) (quoting *Clark v. Commonwealth*, 30 Va. App. 406, 410 (1999))). In considering whether an act was accomplished by intimidation, relevant circumstances include "the victim's age, the relative size of the defendant and victim, the familial relationship between the defendant and victim, and the vulnerable position of the victim." *Bondi*, 70 Va. App. at 90 (quoting *Commonwealth v. Bower*, 264 Va. 41, 46 (2002)).

At the time of the offenses, O.W. was 14 years old and Attah was in his fifties. O.W. viewed Attah not only as an uncle but as a "father figure." She understood that she was "the child" and he was "the adult" in the relationship. Moreover, Attah was O.W.'s legal guardian, and O.W. was aware that he could "kick her out of his house." Although O.W. and Attah were

not consanguineal relatives, the nature of O.W. and Attah's relationship supports a finding that Attah overbore O.W.'s will and accomplished the sexual acts through intimidation. *See Bondi*, 70 Va. App. at 91 (finding it reasonable to conclude that a "mentor and father figure" "exercised emotional dominance over [the victim] through his actions"). Additionally, Attah knew that O.W., her sister, and their father were undocumented immigrants and exploited those circumstances, threatening O.W. that she and her family would lose their housing and be deported if she reported the sexual abuse. O.W., afraid for herself and her family, felt she had no choice but to acquiesce to Attah's demands. *See Benyo*, 38 Va. App. at 655-56 (finding evidence of "psychological pressure and emotional domination" sufficient to prove intimidation).

Furthermore, a rational factfinder could have concluded that immediately before the first assault challenged on appeal, O.W.—a "confused" fourteen-year-old child "trying to figure out what [Attah] was trying to do"—feared "the possibility of bodily injury inherent in the sexual assault itself." *Bondi*, 70 Va. App. at 90; *see also Mohajer v. Commonwealth*, 40 Va. App. 312, 323 (2003) (en banc) (finding fear of the harm inherent in sexual assault where the victim, who was in a "vulnerable position," testified that she was fearful and "had no idea what was going to happen next"). And the same rational factfinder could have concluded that after she experienced pain during the first instance of sexual intercourse, saw blood, and found walking painful, O.W. feared bodily injury every time Attah initiated sexual contact with her thereafter. *See Bondi*, 70 Va. App. at 90; *Bower*, 264 Va. at 46. Based on the totality of the circumstances, we conclude that there was sufficient evidence from which a rational factfinder could have found beyond a

reasonable doubt that Attah committed rape, aggravated sexual battery, and object sexual

penetration through intimidation of O.W.[7]

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*

---

[7] Given this finding, we do not reach whether the evidence was sufficient to show that Attah committed the acts by threat or force. *See Thomas v. Commonwealth*, 303 Va. 188, 198 (2024) ("The doctrine of judicial restraint dictates that generally we decide cases '"on the best and narrowest grounds available."'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).