COURT OF APPEALS OF VIRGINIA

Present: Judges Elder, Frank and Huff
Argued at Chesapeake, Virginia

UNPUBLISHED

SAVANNAH A. O'BERRY

MEMORANDUM OPINION[*] BY
v.     Record No. 2466-11-1          JUDGE GLEN A. HUFF
                                      DECEMBER 18, 2012

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
C. Peter Tench, Judge

Charles E. Haden for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Savannah A. O'Berry ("appellant") appeals her conviction of felony child abuse or

neglect, in violation of Code § 18.2-371.1(A). Following a bench trial in the Circuit Court of the

City of Newport News ("trial court"), appellant was sentenced to ten years' incarceration in the

Virginia Department of Corrections, with nine years suspended. On appeal, appellant contends

that the trial court erred in finding the evidence sufficient to prove beyond a reasonable doubt

that appellant was guilty of felony child abuse or neglect. For the following reasons, this Court

affirms the trial court's conviction.

I. BACKGROUND

On appeal, "'we consider the evidence and all reasonable inferences flowing from that

evidence in the light most favorable to the Commonwealth, the prevailing party at trial.'"

Williams v. Commonwealth, 49 Va. App. 439, 442, 642 S.E.2d 295, 296 (2007) (en banc)

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(quoting Jackson v. Commonwealth, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004)).  So viewed, the evidence is as follows.

In March 2010, Jonathan and Lindsay Sorg ("Jonathan" and "Lindsay" respectively) hired appellant, who operated a daycare out of her home, to watch their son, J.S., who was born on January 14, 2010.  Jonathan and Lindsay met appellant through appellant's husband Wilbert O'Berry ("Wilbert"), who was a fellow police officer of both Lindsay and Jonathan with the City of Newport News Police Department.

On Monday, October 4, 2010, Jonathan dropped off J.S. at appellant's daycare in the morning, and J.S. was in good health with no injuries.  Later that same day, appellant sent Lindsay a text message letting her know that J.S. had a bruise on the tip of his nose down to his lip as a result of a fall from the first step of an inside carpeted staircase onto the linoleum floor after he attempted to climb up onto the step.  After determining that J.S. was okay, Lindsay and Jonathan went out that evening while Heather Monteith ("Monteith"), a friend, babysat J.S. Monteith stated that J.S. was fine that evening and had no other health issues other than the bruise on his face.  Monteith further stated that she did nothing to injure J.S. during the few hours that she babysat him.  J.S. did not suffer any lasting effects from the injury, and was healthy the next day with no further incidents at daycare or at home.

On Wednesday, October 6, 2010, J.S. was doing fine when Jonathan dropped him off at appellant's daycare.  As Lindsay was on her way to pick up J.S. that afternoon, appellant sent her a text message informing her that J.S. had begun to projectile vomit.  When Lindsay arrived at the daycare, J.S. was "very pale," was "crying and . . . looked very sad and sick," and appellant stated that J.S. had only recently started vomiting.  Lindsay took J.S. from appellant, and he instantly projectile vomited all over Lindsay.  Lindsay went into the bathroom to clean J.S. up and noticed "four parallel slashes on his lip" that had not been there previously.  In response to

Lindsay's question of where the slashes came from, appellant replied that they were not new, but were from J.S.'s fall on Monday. After appellant gave Lindsay a blanket for J.S., Lindsay went out to her car to take J.S. home. Lindsay, however, was unable to leave appellant's driveway for fifteen minutes because J.S. was laying limp on her chest while crying and sad, and he would hysterically cry every time she attempted to place him in his car seat. While she was waiting to leave, Lindsay called Jonathan to let him know what was happening, and Jonathan left work to meet her at home.

Upon arriving home, Lindsay handed J.S. to Jonathan, and J.S. immediately vomited on Jonathan. Jonathan took J.S. to the bathroom to clean him off and noticed three red scratches on J.S.'s top lip that had not been there when he had dropped J.S. off at daycare that morning. Jonathan told Lindsay that the scratches were not from J.S.'s fall on Monday after Lindsay told him that appellant had stated they were from his fall. Jonathan then handed J.S. back to Lindsay, who attempted to feed J.S. a bottle. J.S., however, vomited it all back up a few minutes later. After Lindsay rocked J.S. to sleep, Jonathan went to the gym and planned on picking up Pedialyte on the way home since they figured J.S. had another stomach bug.

While Jonathan was gone, Lindsay had to wake up J.S. from his nap because he slept longer than his usual hour to hour-and-a-half nap, which concerned Lindsay since he normally woke up on his own. After waking him up, J.S. again projectile vomited all over Lindsay. Lindsay then sat on the couch rocking J.S. in an attempt to make him feel better. While rocking him, Lindsay rubbed his head for the first time and noticed a "hug[e] gushy spot" the size of a softball cut in half on the back left side of his head. Lindsay immediately called her nursing friend, who told Lindsay that she needed to take J.S. to the emergency room after Lindsay told her J.S.'s symptoms and about the bump on his head. Lindsay also sent a text message to appellant asking appellant if anything had happened to J.S. that day at daycare. Appellant

responded twenty minutes later that the only thing that had occurred that day was J.S.'s vomiting.

Before Lindsay was able to contact Jonathan to let him know that they needed to go to the hospital, J.S. projectile vomited again. Lindsay immediately took J.S. to the tub to try to calm J.S. down and clean him up, which was where Jonathan found them upon arriving home. Lindsay told Jonathan to feel J.S.'s head, and Jonathan stated that J.S.'s whole head "felt like it was caved in and soft." Jonathan and Lindsay then took J.S. to the Riverside Regional Medical Center. On the way there, Jonathan contacted Detective Gordon, with the City of Newport News Police Department, because he suspected something had happened to J.S. that day.

Doctor Nicholas Shawnik, an emergency physician at Riverside Regional Medical Center, examined J.S. around 9:00 p.m. and found a "four by four centimeter hematoma" on the back left side of J.S.'s head. Dr. Shawnik ordered a computed tomography scan (CT scan) of J.S.'s head, which showed J.S. had a "bilateral frontal submerge hematoma and a left occipital skull fracture." Dr. Shawnik testified that a hematoma is "bleeding around the brain" and "a collection of blood that is accumulated" and that J.S.'s skull was actually fractured or broken and there was a lot of soft tissue swelling. Dr. Shawnik then gave J.S. some medicine to help with the vomiting and transferred him to the Children's Hospital of the Kings' Daughter ("CHKD") in Norfolk for a neurological exam with a child specialist neurologist.

After Lindsay and Jonathan learned that J.S. had a skull fracture from the back of his head to the front left temple as well as two brain bleeds, Jonathan called Detective Gordon again to file a report as he believed the injury was not something that could have been accidental. At the same time, Lindsay called appellant and told her what had happened since appellant had been text messaging her requesting updates. Appellant responded that she was sorry, hoped everything was okay, and asked Lindsay to keep her updated. Appellant continued to send text

messages to Lindsay that night and the next day. In one of the text messages, appellant replied, "Please let's [sic] me know as soon as you know something[.] I don't care what time it is. I am so sorry Lindsay[.] [M]aybe I should have called you sooner today[.] I just had no [i]dea[.] I feel so awful. I don't know what to do[.] [I]f you need me to come be with you I will[.] I am sorry."

After three or four days at CHKD, J.S. returned home and continued to see the neurosurgeon weekly or biweekly to monitor the bleeding. Because the bleeding did not go away, J.S. had surgery on December 15, 2010, to drain the blood. As a result of the injury, J.S.'s head had enlarged to the size of an average seven year old's head by the time he was only one-and-a-half years old, but he did not have any motor or speech problems.

Pursuant to the police report that Jonathan filed, Detective Dina Balthis ("Balthis") and Detective Linda Gaddis ("Gaddis"), both with the City of Newport News Police Department, and Sheila Barnardy, a senior case worker with Child Protective Services, went to appellant's house to investigate. Appellant informed them that on October 6, 2010, J.S. was "a little bit snotty," had a rattle in his chest, and was whiney. She stated that J.S. ate and then took an abnormally long nap. After he woke up from his nap, appellant gave J.S. another bottle that he started throwing up around 3:45 p.m. In response to a question, appellant stated that J.S. did not bump his head on furniture or anything that day. Appellant further told them that on October 4, 2010, J.S. fell from the bottom step of a carpeted staircase onto the linoleum floor hitting his right side.

On November 10, 2010, Balthis and Gaddis interviewed appellant again at the police station regarding the details of the events that had transpired on October 6, 2010.[1] During the interview, appellant admitted for the first time that she had dropped J.S. into the playpen that day

---

[1] The interview occurred a month after the incident because the police officers had postponed the investigation until after appellant had her baby as she had been in late term pregnancy on October 6, 2010.

after she had tripped over a toy truck on the floor. Appellant stated that she had fed J.S. a bottle and then took him upstairs around 12:15 p.m. to lay him down for a nap as Wilbert was leaving to pick up their daughter from school. As appellant walked towards the playpen, she stepped on a toy truck, tripped, fell to her knees, and completely lost control of J.S. because her first instinct was to protect her pregnant belly. J.S. landed in the bottom of the playpen pretty hard and started crying. Appellant then picked him up and comforted him. J.S. quieted down relatively quickly, so appellant laid him back down in the playpen for a nap.

Appellant stated that J.S. slept longer than normal, so she woke him up around 3:30 p.m. to give him a bottle. After appellant began feeding J.S., J.S. immediately began to projectile vomit. Appellant stated that she instantly sent a text message to Lindsay letting her know that J.S. was vomiting. As appellant explained what happened, she demonstrated the fall for the police officers in the interview room. After the interview concluded, the police officers removed the playpen from appellant's house, and took it to the police station pursuant to appellant's consent.

On December 29, 2010, Balthis and Gaddis interviewed appellant again at the police station after they realized that the video recording equipment had not recorded the entire November 10, 2010 interview. During this second interview, appellant again demonstrated the October 6, 2010 fall, which was recorded and admitted at trial. During this interview, appellant initially told the police officers that she did not know why she did not tell Lindsay or Jonathan about the incident prior to the November interview, and later stated she did not tell them because she just did not think the incident was significant or that J.S. was hurt. Appellant further admitted that she had told Lindsay that J.S. had not hit his head that day in response to Lindsay's text message asking if J.S. had done so and that even though she had thought about telling Lindsay about the incident in one of the text messages, she just did not tell her. Appellant then

changed her statement by claiming that she did not tell Lindsay and Jonathan because it was hard telling people about things like this that you do not really know, and finally admitted that she did not tell them because she was afraid of them since they were both police officers.

During the interview, appellant told the police officers that carrying a child up the stairs was difficult at that time since she had been nine months pregnant and that she had a lot of pressure from the pregnancy and had been tired. The police officers also stated that they noticed in the initial interview at her home that appellant had a hard time going up the steps in her home and that appellant would hold her back and seemed uncomfortable. In addition, appellant took care of several children at the same time as she was watching J.S., one of which was a special needs child, and she also had a cat and several dogs.

At trial on September 7, 2011, Lindsay testified that prior to the October 6, 2010 incident, appellant always informed them of any incident that occurred with J.S. at the daycare before they arrived to pick J.S. up. Both Jonathan and Lindsay also testified at trial that they did not do anything to J.S. on October 4th or 6th to injure him in any way or to cause the skull fractures.

Dr. Suzanne Starling, a medical director of CHKD's Child Abuse Program, testified at trial as a medical expert in pediatrics with a specialty in child abuse pediatrics. On October 7, 2010, Dr. Starling examined J.S.'s radiology report as well as his entire written medical report prior to physically examining him. Dr. Starling then physically examined J.S. while he was in the intensive care unit. Dr. Starling noticed that J.S. had various injuries on his face as well as significant internal injuries. Dr. Starling testified that J.S. had a very complex skull fracture that started at the very top of the side of his head, trailed down his head, crossed over a natural suture line in the skull, and ended at the very base of his skull as well as an old and new head bleed on his brain.

Dr. Starling stated that the fact that the fracture crossed over a natural bridge was significant because it does not happen in common skull fractures in children, and it takes a significant amount of force to cause this type of fracture. Dr. Starling specifically opined that this type of fracture is not the result of a routine household accident like a child tripping and falling, but would be the result of a child being hit by a moving vehicle, falling off of a moving bicycle, or falling over a balcony.

Dr. Starling further opined that, to a reasonable degree of medical certainty, a fall from the first step of appellant's staircase onto the floor would not cause the type of skull fracture that J.S. sustained. Dr. Starling then testified that with this kind of skull fracture, a baby will usually exhibit concussion symptoms such as crying, fuzziness, inconsolability, fussiness, pain, and a headache followed by "uttered consciousness [sic]," which is typically sleeping in babies. In children, the symptoms will then typically progress within a few hours to paleness, sweatiness, and projectile vomiting, which is caused by the brain swelling and occurs regardless of whether food has been ingested. Dr. Starling then opined that

> the dropping into the pack and play [(playpen)] as exhibited in the video is not capable of producing the force that caused this crack of this skull so, therefore, that does not really count into the history, therefore, without a history that matches this fracture or history that accounts for this significant degree of the force this is an inflicted injury to this child's head.

Dr. Starling further stated that J.S. would have had to be hit in the back of the head on the side of the skull to sustain the type of fracture that he did.

Appellant's counsel moved to strike the Commonwealth's evidence on the basis that the Commonwealth failed to prove the injury to J.S. was the result of a willful act. The trial court overruled the motion.

Appellant then called Wilbert as a witness, who testified that he was home on October 6, 2010, and did not notice anything unusual about J.S. in the morning. Around 12:00 p.m.,

Wilbert left the house to pick up their daughter from school, and J.S. was asleep when he returned home at about 12:30 p.m. After appellant woke J.S. up from his nap around 3:30 p.m., Wilbert fed J.S. his bottle, and J.S. got sick after Wilbert had burped him and placed him on the ground. Wilbert stated that he did not notice anything with regards to any head injury or anything else about J.S.'s head.

Appellant then testified at trial that J.S. had fallen off the first step of a stairway and bruised his nose on October 4, 2010. Appellant also testified regarding the events that took place on October 6, 2010. Appellant stated that Jonathan dropped J.S. off that morning, and J.S. was "a little fussy, [and had] a little bit of wheezing in his chest, rattle in his chest[,] and [a] runny nose." After feeding J.S. around noon, appellant carried J.S. on her hip upstairs to put him down for a nap when she accidentally tripped on a toy. Appellant testified that she lost control of J.S., who somehow landed in the playpen with a "thud" as she fell to her hands and knees.

On initial impact, J.S. immediately began crying. Appellant stated that she picked him up, checked him all over – including his head and back, and found no marks, redness, knots, or anything. Appellant then held J.S. only as long as it took her to check him out before she laid him back down in the playpen to take a nap. When she woke him up around 3:30 p.m., appellant stated that there was no vomit or blood in the playpen, and J.S. reached for her as usual so she took him downstairs to change him and give him a bottle. Appellant admitted that she dropped J.S., but she denied ever shaking him or intentionally doing anything to injure him.

On cross-examination, appellant stated that she did not respond to Lindsay's initial request asking if anything happened because "[h]onestly, I was busy when she texted me." Appellant also stated that she did not tell the police about the fall during the interview the next day because she did not feel that it was significant.

In closing argument, appellant's counsel argued that the Commonwealth failed to prove that appellant willfully acted to cause injury to J.S. and that the willful act was so gross, wanton, or culpable as to show a reckless disregard for human life. After establishing the requirements for "willful" and discussing the extensive evidence from trial, the trial court held that "a reasonable person could only conclude that the unexplained tremendous injury to [J.S.] occurred in the presence of the [appellant]." In addition to discussing the evidence from trial, the trial court specifically noted appellant's various reasons as to why she did not inform the parents about the incident, and Dr. Starling's uncontradicted expert testimony that J.S.'s injury could not have been caused from a fall the way appellant described it.

This appeal followed.

## II. ANALYSIS

On appeal, appellant contends that the trial court erred in finding the evidence sufficient to prove beyond a reasonable doubt that appellant was guilty of felony child abuse or neglect. Specifically, appellant argues that the evidence was insufficient because it failed to establish that appellant willfully injured J.S. and that she was the criminal agent.

## A. Criminal Agent

On appeal, appellant argues that the evidence was insufficient to prove felony child neglect since it failed to prove that appellant was the criminal agent. We do not address this issue, however, as appellant did not preserve it.

Rule 5A:18 provides, in relevant part, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." "Rule 5A:18 requires a litigant to make timely and specific objections, so that the trial court has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary

appeals and reversals.'" Brown v. Commonwealth, 279 Va. 210, 217, 688 S.E.2d 185, 189 (2010) (quoting West v. Commonwealth, 43 Va. App. 327, 337, 597 S.E.2d 274, 278 (2004)). "Under settled principles, the 'same argument must have been raised, with specificity, at trial before it can be considered on appeal.'" Johnson v. Commonwealth, 58 Va. App. 625, 637, 712 S.E.2d 751, 757 (2011) (quoting Correll v. Commonwealth, 42 Va. App. 311, 324, 591 S.E.2d 712, 719 (2004)). "'Making one specific argument on an issue does not preserve a separate legal point on the same issue for review.'" Id. (quoting Edwards v. Commonwealth, 41 Va. App. 752, 760, 589 S.E.2d 444, 448 (2003) (en banc), aff'd by unpublished order, No. 040019 (Va. Oct. 15, 2004)).

While appellant argued below that the evidence was insufficient, she never asserted that the evidence was insufficient on the basis that it did not establish that appellant was the criminal agent. Rather, appellant argued below that the Commonwealth failed to prove that she willfully injured J.S., thus limiting her sufficiency argument. Therefore, appellant waived the argument that she was not the criminal agent and Rule 5A:18 bars this Court's consideration of the issue on appeal. Furthermore, appellant does not argue that we should invoke either the good cause or ends of justice exceptions to Rule 5A:18, and we will not consider Rule 5A:18 exceptions *sua sponte*. Edwards, 41 Va. App. at 761, 589 S.E.2d at 448.

## B. Willful

Appellant next argues that the trial court erred in finding the evidence sufficient when the evidence failed to prove that appellant acted willfully. Appellant asserts that the evidence, at best, supports the conclusion that appellant was negligent in dropping J.S. or in failing to promptly report the incident.

In a challenge to the sufficiency of the evidence, we "'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without

evidence to support it.'" Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447

(2003) (en banc) (quoting Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77

(2002)). The reviewing court, under this standard, does not "ask itself whether *it* believes that

the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443

U.S. 307, 318-19 (1979) (emphasis in original and citation omitted). Instead, the reviewing court

asks whether "*any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." Id. at 319 (emphasis in original).

"'Circumstantial evidence [presented during the course of the trial] is as competent and is

entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude

every reasonable hypothesis except that of guilt.'" Salcedo v. Commonwealth, 58 Va. App. 525,

535, 712 S.E.2d 8, 12 (2011) (alteration in original) (quoting Holloway v. Commonwealth, 57

Va. App. 658, 665, 705 S.E.2d 510, 513 (2011)). "'The statement that circumstantial evidence

must exclude every reasonable theory of innocence is simply another way of stating that the

Commonwealth has the burden of proof beyond a reasonable doubt.'" Id. at 535, 712 S.E.2d at

12-13 (quoting Commonwealth v. Hudson, 265 Va. 505, 513, 578 S.E.2d 781, 785 (2003)).

Furthermore,

> "[w]hether the hypothesis of innocence is reasonable is itself a
> 'question of fact,' Emerson v. Commonwealth, 43 Va. App. 263,
> 277, 597 S.E.2d 242, 249 (2004) (citation omitted), subject to
> deferential appellate review, Kelly, 41 Va. App. at 259, 584 S.E.2d
> at 448." Haskins [v. Commonwealth], 44 Va. App. [1,] 9, 602
> S.E.2d [402,] 406 [(2004)]. "Merely because defendant's theory of
> the case differs from that taken by the Commonwealth does not
> mean that every reasonable hypothesis consistent with his
> innocence has not been excluded." Miles v. Commonwealth, 205
> Va. 462, 467, 138 S.E.2d 22, 27 (1964). "By finding the defendant
> guilty, therefore, the factfinder 'has found by a process of
> elimination that the evidence does not contain a reasonable theory
> of innocence.'"

Clanton v. Commonwealth, 53 Va. App. 561, 572-73, 673 S.E.2d 904, 910 (2009) (en banc) (quoting Haskins, 44 Va. App. at 9, 602 S.E.2d at 406).

In addition, "[t]he credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998).

Under Code § 18.2-371.1(A):

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 who by willful act or omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child shall be guilty of a Class 4 felony. For purposes of this subsection, "serious injury" shall include but not be limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, (vi) forced ingestion of dangerous substances, or (vii) life-threatening internal injuries.

"Code § 18.2-371.1(A) proscribes a willful act or omission." Mangano v. Commonwealth, 44 Va. App. 210, 214, 604 S.E.2d 118, 120 (2004).

"'Willful' generally means an act done with a bad purpose, without justifiable excuse, or without ground for believing it is lawful. The term denotes 'an act which is intentional, or knowing, or voluntary, as distinguished from accidental.'" Ellis v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999) (quoting Snead v. Commonwealth, 11 Va. App. 643, 646, 400 S.E.2d 806, 807 (1991)). "The requirement that the act be 'willful' does not mean, . . . that the Commonwealth was required to prove appellant intended to injure [the child] . . . ." Collado v. Commonwealth, 33 Va. App. 356, 366, 533 S.E.2d 625, 630 (2000). Rather, "'the terms "bad purpose" or "without justifiable excuse," while facially unspecific, necessarily imply knowledge

- 13 -

that particular conduct will likely result in injury or illegality.'" Id. (quoting Ellis, 29 Va. App. at 554, 513 S.E.2d at 456).

In the present case, the evidence supports the trial court's finding that appellant willfully injured J.S. On October 6, 2010, Jonathan dropped J.S. off at daycare in the morning, and J.S. was in good health and had been in good health for several days other than the bruising from the October 4, 2010 fall. When Wilbert left the home around 12:00 p.m. to pick up their daughter from school, there had been no incidents that morning and appellant was home with J.S. and the other children. After feeding J.S. a bottle, appellant took him upstairs around 12:15 p.m. to put him down for a nap. Appellant claims that when she was going to lay J.S. down for his nap, she accidentally tripped over a toy and J.S. somehow fell from her hip and landed with a "thud" in the playpen with no injuries. This hypothesis of innocence, however, was rejected by the trial court.

At trial, Dr. Sterling, an expert in pediatric care, opined that J.S.'s complex skull fracture could not have been caused by a fall into the playpen, but that it occurred from something with a more significant amount of force. Dr. Sterling further stated that since there was an absence of an explanation of an accident with the requisite degree of force, J.S.'s injury was an "inflicted" head injury.

With regard to the head injury, Dr. Sterling testified that a child who has sustained a skull fracture will initially exhibit symptoms such as crying, fussiness, and sleepiness. The symptoms will then progress within a few hours to paleness and projectile vomiting due to the swelling of the brain. Although appellant claimed that J.S. was not injured, J.S. exhibited several of these symptoms. Appellant stated that J.S. began crying after the incident occurred and that he then took an abnormally long nap from which she had to wake him up around 3:30 p.m. Then, J.S.

- 14 -

was pale and began projectile vomiting after appellant attempted to feed him a bottle, and continued to do so even after Lindsay took him home.

Furthermore, the trial court, as the factfinder, was entitled to conclude that appellant lied to the police in order to conceal her guilt and that her testimony at trial was untrue. While appellant told Lindsay that J.S. was vomiting, she did not indicate that anything else had occurred that day and claimed that the additional injuries to J.S.'s face were the result of his fall on October 4, 2010. Even after Lindsay pressed appellant for an answer once the doctors had diagnosed J.S. with a skull fracture, appellant responded that nothing had occurred to J.S. that day other than the vomiting and stated that it had been a normal day.

When appellant spoke with the police officers, appellant continued to deny that anything happened to J.S. on October 6, 2010, other than his vomiting. Then, over a month later, appellant told the police officers that she tripped over a toy truck and lost control of J.S. resulting in J.S. landing in the playpen with a "thud." Appellant stated that she was not exactly sure how J.S. landed face up in the playpen, but claimed that he did so with no resulting injuries. After telling the police officers about the incident, appellant proceeded to give various explanations as to why she did not initially tell anyone about the fall.

Based on the foregoing, this Court holds that the trial court did not err in finding the evidence sufficient to prove that J.S.'s injury was the result of a willful act on the appellant's part and was not the result of an accidental trip and fall as appellant alleges. Accordingly, we affirm the judgment of the trial court.

Affirmed.